**In re Stephen E. WRIGHT.**

No. 92–1437.

United States Court of Appeals, Federal Circuit.

July 20, 1993.

Peter M. Peer, Mallinckrodt & Mallinckrodt, Salt Lake City, UT, argued for appellants. With him on the brief was Philip A. Mallinckrodt.

Teddy S. Gron, Associate Sol., Office of the Sol., Arlington, VA, argued for appellee. With him on the brief was Fred E. McKelvey, Sol. Of counsel were Richard E. Schafer, John W. Dewhirst, Albin F. Drost and Lee E. Barrett.

Before RICH, NEWMAN, and RADER, Circuit Judges.

RICH, Circuit Judge.

Dr. Stephen E. Wright appeals from the January 16, 1992 decision of the Board of Patent Appeals and Interferences (Board) of the United States Patent and Trademark Office (PTO) sustaining the Examiner's rejection of claims 1–23, 15–42, and 45–48 of application Serial No. 06/914,620 [1] under 35

---

1. Application Serial No. 06/914,620, filed on October 2, 1986, is a continuation of Serial No. 06/469,985, filed February 25, 1983, now abandoned.

U.S.C. § 112, first paragraph, as unsupported by an enabling disclosure.[2] We affirm.

## I. BACKGROUND

### A. *The Invention*

The claims on appeal are directed to processes for producing live, non-pathogenic vaccines against pathogenic RNA viruses (claims 1–10, 22–37, 40, 45, and 46), vaccines produced by these processes (claims 11, 12, 15–21, 38, and 39), and methods of using certain of these claimed vaccines to protect living organisms against RNA viruses (claims 41 and 42). Wright's specification provides a general description of these processes, vaccines, and methods of use, but only a single working example.

In this example, Wright describes the production of a recombinant vaccine which confers immunity in chickens against the RNA tumor virus known as Prague Avian Sarcoma Virus (PrASV), a member of the Rous Associated virus (RAV) family. To produce this vaccine, Wright first identified the antigenic gene region of the genome of PrASV as being in the envelope A (*env* A) gene region of this virus, and then isolated and cloned a large quantity of this antigenic gene region. Following cloning, Wright introduced by transfection the cloned *env* A genes into C/O cells, a particular chicken embryo cell line. The C/O cells were then infected with the endogenous, non-oncogenic, O-type Rous Associated Virus (RAV–O) and incubated. Genetic recombination and viral replication occurred during incubation, resulting in an im-

pure vaccine containing particles of the recombinant virus referred to as RAV–O Ac$^n$, or RAV–O–A.[3] Wright then purified this vaccine to obtain a vaccine containing only genetic recombinant RAV–Ac$^n$ virus particles. The Examiner ultimately allowed claims 13, 14, 43, and 44, which are specific to the particular process and vaccine disclosed in this example.[4]

Wright seeks allowance, however, of claims which would provide, in varying degrees, a much broader scope of protection than the allowed claims. For example, independent process claim 1 reads:

> A process for producing a live non-pathogenic vaccine for a pathogenic RNA virus, comprising the steps of identifying the antigenic and pathogenic gene regions of said virus; performing gene alteration to produce a genome which codes for the antigenicity of the virus, but does not have its pathogenicity; and obtaining an expression of the gene.

Dependent claims 2–10, 22–35, and 40 recite additional limitations to this process. Independent claims 36 and 45 and claims 37 and 46 dependent therefrom, respectively, are also directed to processes for producing vaccines.

Independent product claim 11 reads:

> A live, non-pathogenic vaccine for a pathogenic RNA virus, comprising an immunologically effective amount of a viral antigenic, genomic expression having an anti-

---

2. In an April 12, 1992 reconsideration decision, the Board denied Wright's request that it modify its original decision.

3. *Transfection, infection, genetic recombination,* and viral replication collectively constitute a procedure known as marker rescue.

4. The allowed claims read:
   *Claim 13* A live, non-pathogenic vaccine for a pathogenic RNA virus, comprising an immunologically effective amount of a viral, antigenic, genomic expression having an antigenic determinant region of the RNA virus, but no pathogenic properties, the viral, antigenic, genomic expression being the RAV–Ac$^n$ virus.
   *Claim 14* A vaccine according to claim 13, wherein the vaccine has been purified by selection for the expression of the antigenic genome.

*Claim 43* A process for producing a live, non-pathogenic, recombinant vaccine conferring immunity against the PrASV avian tumor virus in chickens, comprising inserting the PrASV env A gene into a RAV–O virus by marker rescue such that said PrASV env A gene replaces the endogenous envelope gene of the RAV–O virus; and selecting for the recombinant in C/E cells.
*Claim 44* A live, non-pathogenic, recombinant vaccine conferring immunity against the PrASV avian tumor virus in chickens, in which vaccine the PrASV env A gene has been inserted into a RAV–O virus by marker rescue to replace the endogenous envelope gene of the RAV–O virus, and the recombinant has been selected for in C/E cells.

genic determinant region of the RNA virus, but no pathogenic properties.

Dependent claims 15–21 recite additional limitations to this vaccine. Independent claims 38 and 47 and claims 39 and 48 dependent therefrom, respectively, are also directed to vaccines.

Dependent claims 41 and 42 recite methods of protecting living organisms against RNA viruses, which comprise introducing into a host an immunologically effective amount of the vaccine of claims 11 and 38, respectively.

## B. *The Rejection*

The Examiner took the position in her Examiner's Answer that the claims presently on appeal are not supported by an enabling disclosure because one of ordinary skill in the art would have had to engage in undue experimentation in February of 1983 (the effective filing date of Wright's application) to practice the subject matter of these claims, given their breadth, the unpredictability in the art, and the limited guidance Wright provides in his application. The Examiner noted that many of Wright's claims read on vaccines against *all* pathogenic RNA viruses, even though RNA viruses are a very diverse and genetically complex group of viruses which include, among others, acquired immunodeficiency syndrome (AIDS) viruses, leukemia viruses, and sarcoma viruses. The Examiner argued that Wright's single working example merely evidenced that Wright had obtained successfully a particular recombinant virus vaccine, and that this single success did not provide "sufficient likelihood" that other recombinant RNA viruses could be constructed without undue experimentation, or if they were constructed, that they would be useful in the design of live viral vaccines. The Examiner noted the inability of the scientific community to develop an efficacious AIDS virus vaccine for humans despite devoting a considerable amount of time and money to do so.

The Examiner further argued that, even though retroviruses as a class may exhibit similar gene order and possess envelope proteins, this alone does not support a general conclusion that all RNA virus envelope proteins will confer protection against the corresponding virus. The Examiner asserted that this held true even among avian RNA tumor viruses. At page 11 of her Answer, the Examiner stated that "one envelope gene's immunogenicity cannot be extrapolated to another envelope gene. The efficacy of each should be ascertained individually."

To support the foregoing, the Examiner relied upon an article by Thomas J. Matthews et al., *Prospects for Development of a Vaccine Against HIV*, in Human Retroviruses, Cancer, and AIDS: Approaches to Prevention and Therapy 313–25 (1988). This article indicates that AIDS retroviruses, which represent only a subset of all RNA viruses, were known even as late as 1988 to show great genetic diversity, including divergent virus envelopes. It further indicates that, although AIDS retroviruses elicited strong immune responses in goats and chimps in 1988, the resulting antibodies did not prevent retrovirus infectivity. Moreover, this article also recognizes at page 321 that, as of 1988, animal models for HIV infection and disease were likely to be imperfect, and therefore testing of primary vaccine candidates in man was necessary to determine safety, immunogenicity and efficacy.

Finally, the Examiner also argued that, irrespective of immunogenicity and vaccine considerations, the methods of identification, isolation, cloning, and recombination which Wright describes in his application in only a very general manner were not so developed in 1983 as to enable, without undue experimentation, the design and production of recombinant virus vaccines against any and all RNA viruses. The Examiner also asserted that the considerable amount of time and effort that it took Wright to construct the particular avian recombinant virus described in his single working example and to establish its efficacy as a vaccinating agent illustrates the amount of undue experimentation that would have been required in February of 1983 to practice Wright's invention, especially given that the efficacy of the developed virus could not be extrapolated with any certainty to other recombinant viruses at that time.

## C. *The Board Decision*

In its January 16, 1992 decision,[5] the Board held that the Examiner did not err in questioning the enablement of the physiological activity required by the appealed claims, given the breadth of these claims and the fact that a vaccine must by definition provoke an immunoprotective response upon administration. The Board found that Wright had failed to establish that the general description of his invention set forth in his application was anything more, in February of 1983, than an invitation to experiment. The Board agreed with the Examiner that this general description does not set forth such sufficient detailed guidance that one of ordinary skill in the art would have had any reasonable expectation of success in constructing other vaccines against other RNA viruses. The Board additionally noted that the Examiner only allowed the claims limited to Wright's single working example after Wright submitted *in vivo* evidence of the efficacy of this vaccine.

The Board further held that the record did not support Wright's arguments that his single working example enables some of his dependent claims which are closer in scope to the allowed claims than to independent claims 1 and 11. The Board found that, even if Wright was correct in stating that it was generally known that an "immune response" is assured by use of an antigenic envelope protein, the record did not establish that such an "immune response" would have been an immunoprotective one, or moreover, that one skilled in this art would have expected such a result in February of 1983. The Board relied upon the Matthews et al. article as evidencing that "the mere use of an envelope protein gene in the present invention is not seen to necessarily result in the obtention of successful vaccines throughout the scope of even these more limited claims." Bd.Dec. at 6.

As to Wright's request that the Board consider several declarations and exhibits of record, the Board stated that it found no reason to consider this evidence with any particularity since Wright had failed to advance any specific arguments based on this evidence or to explain its relevance.

## II. DISCUSSION

### A.

■ The first paragraph of 35 U.S.C. § 112 requires that the specification of a patent contain a written description of the claimed invention and the manner and process of making and using that invention in such full, clear, concise, and exact terms as to enable any person skilled in the art to which that invention pertains, or with which it is most nearly connected, to make and use that invention. As a statutory requirement, enablement is a question of law that we review de novo; however, we review for clear error any underlying facts found by the Board in rendering its enablement determination. *In re Vaeck*, 947 F.2d 488, 495, 20 USPQ2d 1438, 1444 (Fed.Cir.1991); *In re Wands*, 858 F.2d 731, 735, 8 USPQ2d 1400, 1404 (Fed. Cir.1988).

■ Although not explicitly stated in section 112, to be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without "undue experimentation." *Vaeck*, 947 F.2d at 495, 20 USPQ2d at 1444; *Wands*, 858 F.2d at 736–37, 8 USPQ2d at 1404; *In re Fisher*, 427 F.2d 833, 839, 166 USPQ 18, 24 (CCPA 1970) (the first paragraph of section 112 requires that the scope of protection sought in a claim bear a reasonable correlation to the scope of enablement provided by the specification). Nothing more than objective enablement is required, and therefore it is irrelevant whether this teaching is provided through broad terminology or illustrative examples. *In re Marzocchi*, 439 F.2d 220, 223, 169 USPQ 367, 369 (CCPA 1971).

■ When rejecting a claim under the enablement requirement of section 112, the PTO bears an initial burden of setting forth a reasonable explanation as to why it believes

---

5. The Board stated in its opinion that it was affirming the Examiner's rejection under section 112 for the reasons set forth in the Examiner's Answer and that the Board's added comments were for emphasis only.

that the scope of protection provided by that claim is not adequately enabled by the description of the invention provided in the specification of the application; this includes, of course, providing sufficient reasons for doubting any assertions in the specification as to the scope of enablement. If the PTO meets this burden, the burden then shifts to the applicant to provide suitable proofs indicating that the specification is indeed enabling. *Marzocchi*, 439 F.2d at 223–24, 169 USPQ at 369–70.

## B.

■ In the present case, the PTO set forth a reasonable basis for finding that the scope of the appealed claims is not enabled by the general description and the single working example in the specification. Consequently, the burden shifted to Wright to present persuasive arguments, supported by suitable proofs where necessary, that the appealed claims are truly enabled. Wright failed to meet this burden.

Both the Examiner and the Board correctly pointed out that Wright's appealed claims are directed to vaccines, and methods of making and using these vaccines, which must by definition trigger an immunoprotective response in the host vaccinated; mere antigenic response is not enough.[6] Both also correctly pointed out that Wright attempts to claim in many of the appealed claims *any and all* live, non-pathogenic vaccines, and processes for making such vaccines, which elicit immunoprotective activity in *any* animal toward *any* RNA virus. In addition, both properly stressed that many of the appealed claims encompass vaccines against AIDS viruses and that, because of the high degree of genetic, antigenic variations in

such viruses, no one has yet, years after his invention, developed a generally successful AIDS virus vaccine.

The Matthews et al. article, published approximately 5 years after the effective filing date of Wright's application, adequately supports the Examiner's and the Board's position that, in February of 1983, the physiological activity of RNA viruses was sufficiently unpredictable that Wright's success in developing his specific avian recombinant virus vaccine would not have led one of ordinary skill in the art to believe reasonably that all living organisms could be immunized against infection by any pathogenic RNA virus by inoculating them with a live virus containing the antigenic code but not the pathogenic code of that RNA virus. The general description and the single example in Wright's specification, directed to a uniquely tailored *in vitro* method of producing in chicken C/O cells a vaccine against the PrASV avian tumor virus containing live RAV–Ac[n] virus particles, did nothing more in February of 1983 than invite experimentation to determine whether other vaccines having *in vivo* immunoprotective activity could be constructed for other RNA viruses.

■ Wright argues that he has constructed successfully an *env* C recombinant vaccine according to the present invention and that certain recombinant AIDS virus vaccines carrying SIV (simian immunodeficiency virus) and HIV (human immunodeficiency virus) envelope genes have been produced which confer protective immunity in the animal models where they have been tested,[7] and that these developments illustrate that the art is not so unpredictable as to require undue experimentation. However, all of these developments occurred after the effec-

---

6. Wright defines "vaccine" at page 1 of his specification as being a "material which induces an organism to acquire immunity against disease." Furthermore, as noted by the Board, the *Dictionary of Biochemistry* 330 (John Wiley & Sons 1975), defines "vaccine" as a suspension of antigens derived from viruses or bacteria that, upon administration, will produce active immunity and provide protection against those viruses or bacteria or related viruses or bacteria.

7. *See* Shio–Luk Hu et al., *Protection of Macaques Against SIV Infection by Subunit Vaccines of SIV*

*Envelope Glycoprotein gp160*, 255 Science 456–59 (1992); Shio–Luk Hu et al., *Neutralizing Antibodies Against HIV–1 BRU and SF2 Isolates Generated in Mice Immunized with Recombinant Vaccinia Virus Expressing HIV–1 (BRU) Envelope Glycoproteins and Boosted with Homologous gp 160*, 7 AIDS RESEARCH AND HUMAN RETROVIRUSES 616–20 (1991); Phillip W. Berman et al., *Protection of Chimpanzees from Infection by HIV–1 after Vaccination with Recombinant Glycoprotein gp120 but not gp160*, 345 Nature 622–625 (1990).

tive filing date of Wright's application and are of no significance regarding what one skilled in the art believed as of that date.[8] Furthermore, the fact that a few vaccines have been developed since the filing of Wright's application certainly does not by itself rebut the PTO's assertions regarding undue experimentation. Moreover, whether a few AIDS virus vaccines have been developed which confer immunity in some animal models is not the issue. The Examiner made reference to the difficulty that the scientific community is having in developing generally successful AIDS virus vaccines merely to illustrate that the art is not even today as predictable as Wright has suggested that it was back in 1983.

■ Wright also argues that several affidavits of record, namely, an October 22, 1984 declaration by Wright, an October 23, 1984 affidavit by O'Neill, and October 28, 1988 affidavits by Bennett and Burnett, successfully rebut the Board's and the Examiner's assertions regarding undue experimentation. However, Wright did not set forth in his brief to the Board any specific arguments regarding these affidavits, as required by 37 CFR 1.192(a), and therefore we are not required to address the arguments that Wright presents in this appeal regarding these affidavits. *Chester v. Miller,* 906 F.2d 1574, 1578 n. 6, 15 USPQ2d 1333, 1337 n. 6 (Fed. Cir.1990); *In re Wiseman,* 596 F.2d 1019, 1022, 201 USPQ 658, 661 (CCPA 1979).

■ Nevertheless, we note that each of these affidavits fails in its purpose because each merely contains unsupported conclusory statements as to the ultimate legal question.[9] *See In re Buchner,* 929 F.2d 660, 661, 18 USPQ2d 1331, 1332 (Fed.Cir.1991); *In re Brandstadter,* 484 F.2d 1395, 1405–06, 179 USPQ 286, 293–94 (CCPA 1973). Furthermore, Burnett and Bennett do not even indicate in their affidavits that they actually reviewed the specification of Wright's application. In addition, although Wright states in his declaration that the individual steps making up his claimed process were "well within the skill of the art" at the time that he filed his application and makes reference to a list of publications that he contends supports this conclusory statement, a list which Wright also makes reference to in his arguments to this court, Wright fails to point out with any particularity in this declaration, or in his arguments to this court, how the listed documents evidence that a skilled artisan in February of 1983 would have been able to carry out, without undue experimentation, the identification, isolation, cloning, recombination, and efficacy testing steps required to practice the full scope of the appealed claims.

### · C.

Wright further argues that, even if those claims which provide a broad scope of protection are not enabled, this is not the case as to those claims restricted to vaccines against

---

8. In his appeal to this court, Wright all too frequently slips into using the present tense to discuss the state of the art and what a skilled artisan would believe given Wright's success with one avian virus. We note, however, that the issue is not what the state of the art is today or what a skilled artisan today would believe, but rather what the state of the art was in February of 1983 and what a skilled artisan would have believed at that time. *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384, 231 USPQ 81, 94 (Fed.Cir.), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *In re Hogan,* 559 F.2d 595, 604, 194 USPQ 527, 535 (CCPA 1977). Wright's tendency to employ the present tense often makes it difficult to determine whether Wright is asserting that certain information was known prior to February of 1983 or simply that that information is now known in the art.

9. For example, O'Neill stated in his affidavit that the specification provided him "with sufficient information to produce a vaccine for any known pathogen in accordance with the procedural steps claimed" and that he could not "foresee any problem in producing similar vaccines for other pathogens." Bennett and Burnett merely declared in their affidavits that, at the time they worked with Wright, they believed that the specific vaccine that they were developing was simply one example within a broader concept. In his October 22, 1984 declaration, Wright stated that he knew "of no reason why the specific vaccine tested is not truly indicative of successful application of other embodiments of the invention within the purview of the teachings and claims of my patent application." Wright further stated that "[although the project has been primarily directed toward the production and testing of a specific vaccine for a specific virus, the concept has been inherently generic as claimed."

avian tumor viruses. Wright maintains that there is no doubt that it was known in 1983 that the technique of producing a live vaccine proven effective for one particular strain of avian RNA viruses would be effective as to other strains of avian RNA viruses. Wright argues that the scientific literature supports the position that the art was predictable at least with respect to avian RNA viruses, because gene function and order are similar among all avian RNA viruses.

We are not persuaded. Wright has failed to establish by evidence or arguments that, in February of 1983, a skilled scientist would have believed reasonably that Wright's success with a particular strain of an avian RNA virus could be extrapolated with a reasonable expectation of success to other avian RNA viruses. Indeed, Wright has failed to point out with any particularity the scientific literature existing in February of 1983 that supports his position. Furthermore, Wright's May 17, 1989 declaration indicates that Wright himself believed during the relevant time period that *in vivo* testing was necessary to determine the efficacy of vaccines. In this declaration, Wright stated in pertinent part:

> Preparation of a patent application following conception of the invention awaited such time as there was a reasonable expectation that the results of innoculation [sic] would be successful. *This became apparent only by reason of survival of the chickens that had been innoculated* [sic].

Wright now argues that all he meant by the foregoing was that *in vivo* efficacy testing was necessary for the first avian RNA viruses vaccine that he developed in order to prove his hypothesis. Wright asserts that, once his hypothesis had been proven, a skilled artisan would have expected that similar *in vivo* results could be obtained for vaccines developed for other avian retroviruses. However, a paper that Wright co-authored with David Bennett, titled "Avian Retroviral Recombinant Expressing Foreign Envelope Delays Tumor Formation of ASV–A–Induced Sarcoma," which was attached to

a declaration by Wright dated November 19, 1985, suggests that, even as late as 1985, the genetic diversity existing among chickens alone required efficacy testing even among the members of this narrow group.[10] Accordingly, we see no error in the Board's finding that one skilled in the art would not have believed as early as February of 1983 that the success of Wright's one example could be extrapolated with a reasonable expectation of success to all avian RNA viruses.

### D.

Finally, Wright argues that each of the appealed claims should be considered independently to determine whether it satisfies the enablement requirement of section 112. This we have done. Wright's arguments to this court, however, are directed almost entirely to why he believes that the specification of his application enables the appealed claims as a whole or at least those claims limited to avian RNA viruses. Although Wright does refer in passing to each of the appealed claims, he does little more than recite the particular limitations recited in these claims, failing to point out how the enablement requirement is satisfied as to each of these claims independently. Consequently, Wright has failed to provide us with any justification for finding that the Board erred in sustaining the Examiner's rejection, even with respect to some of the more limited claims.

### CONCLUSION

For the foregoing reasons, the decision of the Board is affirmed.

***AFFIRMED.***

---

10. The paper states in pertinent part: "Recent observations suggest line SC chickens do not respond well immunologically.... Follow up experiments will include other chicken lines. Mechanisms of protection are also under study."